**CASE NO. 2:21-cv-7572-JAK**

**UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA**

In re: Zetta Jet USA, Inc., et al.

*Debtors.*

JONATHAN D. KING, solely in his capacity as Chapter 7
Trustee of Zetta Jet USA, Inc and Zetta Jet PTE, Ltd.,

*Appellant*,

vs.

Li Qi, Universal Leader Investment Limited, Glove Assets Investment Limited, and
Truly Great Global Limited,

*Appellees.*

Appeal from the United States Bankruptcy Court, Central District of California
Bankruptcy Case No. 2:17-bk-21386-SK
Adversary Case No. 2:19-ap-01383-SK

**APPELLANT'S OPENING BRIEF**

DAVID B. FARKAS (SBN 257137)
DLA PIPER LLP (US)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067-4704
T (310) 595-3412
F (310) 595-3312
E david.farkas@us.dlapiper.com

*Counsel for Appellant*

JOHN K. LYONS (Pro Hac Vice)
JEFFREY S. TOROSIAN (Pro Hac Vice)
JOSEPH A. ROSELIUS (Pro Hac Vice)
DLA PIPER LLP (US)
444 West Lake Street, Suite 900
Chicago, Illinois 60606-0087
T (312) 368-4000
F (312) 236-7516
E john.lyons@us.dlapiper.com
E jeffrey.torosian@us.dlapiper.com
E joseph.roselius@us.dlapiper.com

*Counsel for Appellant*

DLA PIPER LLP (US)
LOS ANGELES

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Both debtors are named in the caption. Zetta Jet PTE Ltd. owns 100 percent of the shares of Zetta Jet USA Inc. Zetta Jet PTE Ltd. is partially owned by Truly Great Global Limited and Asia Aviation Holdings PL, neither of which is publicly held and, upon information and belief, neither of which has a parent corporation. No publicly held corporation owns 10 percent or more of the stock in either debtor.

1

### **TABLE OF CONTENTS**

STATEMENT OF APPELLATE JURISDICTION .................................................. 1

STATEMENT OF THE ISSUES ........................................................................ 1

STANDARD OF REVIEW ................................................................................ 2

STATEMENT OF THE CASE ........................................................................... 2

I.    Statutory Framework. ............................................................................ 2

    A.    The federal bankruptcy system is premised on the historical practice of equity jurisprudence. ................................................ 2

    B.    The Bankruptcy Code provides the statutory framework governing the administration of claims and distribution of property of the estate to creditors on a fair and equitable basis .......... 3

    C.    The Bankruptcy Code gives a trustee broad powers to avoid and recover transfers and obligations for the estate. ................. 4

    D.    The Bankruptcy Code also grants the bankruptcy court inherent equitable powers. ........................................................... 4

II.    Statement of the Facts. ......................................................................... 5

    A.    The Debtors' operations. ........................................................... 5

    B.    The initial acquisitions of Planes 6 and 7. ................................ 6

    C.    The 2016 Minsheng Refinancing of Planes 6 and 7. ................ 8

    D.    The Third Investment. ............................................................... 10

    E.    The Debtors' Downfall. ............................................................ 11

III.    Relevant Procedural History. ............................................................. 11

    A.    UL and Glove Assets file proofs of claim. ............................. 11

    B.    The Trustee files the adversary proceeding to avoid transfers and obligations with the Defendants. ...................... 12

    C.    Rulings Presented for Review. ................................................. 13

SUMMARY OF THE ARGUMENT .................................................................. 14

ARGUMENT ................................................................................................. 15

I.    The Trustee asserted valid claims to avoid the relevant transactions. ..... 15

    A.    Under Nabisco and Morrison, § 548 applies extraterritorially. ......... 17

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

B.   The Trustee's claims involve a domestic application of § 548 because the transfers were made, and obligations incurred, in the U.S. ......................................................19

    1.   The first prong of § 548: Transfers Made. ............................19

    2.   The second prong of § 548: Obligations Incurred..................24

    3.   The Court may disgorge or avoid transfers (including extraterritorial transfers) made on account of domestic obligations, and a trustee may recover subsequent transfers outside of the U.S. under § 550. ..............................28

C.   The Trustee may bring his avoidance claims because the relevant transactions are subject to federal bankruptcy law pursuant to the claims administration process. ..........................31

    1.   The proofs of claim, the fraudulent transfers/obligations and effect on distributions to creditors. ...................................31

    2.   Submitting a proof of claim on a transaction renders all aspects of that transaction subject to federal bankruptcy law, which makes the presumption against extraterritoriality irrelevant......................................................32

II.   Count VI of the FAC states a claim for recharacterization....................37

III.   The Bankruptcy Court erred in denying the Trustee's motion for leave to amend Counts VIII and IX.................................................................37

IV.   The FAC states a § 502(d) claim...........................................................38

CONCLUSION................................................................................................39

DLA PIPER LLP (US)
LOS ANGELES

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**                                                                **Page(s)**

3
4
*Allen v. Cty. of Los Angeles*,
  2009 WL 666449 (C.D. Cal. Mar. 12, 2009) ....................................................38

5
6
*In re Ampal-Am.*,
  562 B.R. 601 (Bankr. S.D.N.Y. 2017) ...........................................................24

7
8
*In re Appleseed's Intermediate Holdings, LLC*,
  470 B.R. 289 (D. Del. 2021) ........................................................................20

9
10
*In re Arcapita Bank B.S.C.(c)*,
  575 B.R. 229 (Bankr. S.D.N.Y. 2017) ................................16, 19, 20, 21, 22, 23

11
12
*In re Bay Plastics*,
  187 B.R. 315 (Bankr. C.D. Cal. 1995) ............................................................20

13
*Beavers v. New Penn Fin. LLC*,
  2018 WL 385421 (E.D. Cal. Jan. 11, 2018) .....................................................38

14
15
*In re Bonham*,
  229 F.3d 750 (9th Cir. 2000) ..........................................................................5

16
17
*In re Brooke Corp.*,
  541 B.R. 492 (Bankr. D. Kansas 2015)........................................................28, 31

18
19
*In re Bullion Reserve*,
  922 F.2d 544 (9th Cir. 1991) .........................................................................29

20
21
*Ex parte Christy*,
  44 U.S. 292 (1845) .......................................................................................33

22
23
*In re CIL Ltd.*,
  582 B.R. 46 (Bankr. S.D.N.Y. 2018) .............................................................24

24
*DCD Programs, Ltd. v. Leighton*,
  833 F.2d 183 (9th Cir. 1987)..........................................................................38

25
26
*Diaz-Barba v. Kismet Acquisition, LLC*,
  2010 WL 2079738 (S.D. Cal. May 20, 2010) ...................................................34

27
28
*In re FAH Liquidating Corp.*,
  572 B.R. 117 (Bankr. D. Del. 2017)...........................................................17, 24

*In re French*,
   440 F.3d 145 (4th Cir. 2006) ................................................................ 1, 17, 18, 31

*Gardner v. N.J.*,
   329 U.S. 565 (1947) .................................................................................. 32

*Gompper v. VISX, Inc.*,
   298 F.3d 893 (9th Cir. 2002) ...................................................................... 2

*In re Icenhower*,
   757 F.3d 1044 (9th Cir. 2014) .................................................................. 16

*In re Incomnet, Inc.*,
   463 F.3d 1064 (9th Cir. 2006) .................................................................. 24

*In re Interbulk, Ltd.*,
   240 B.R. 195 (Bankr. S.D.N.Y. 1999) ...................................................... 34

*In re International Manufacturing Group, Inc.*,
   2016 WL 7163588 (Bankr. E.D. Cal. Dec. 6, 2016) .................................. 29

*Katchen v. Landy*,
   382 U.S. 323 (1966) ................................................................. 3, 32, 33, 34, 36

*Lagenkamp v. Culp*,
   498 U.S. 42 (1990) .................................................................... 32, 33, 36

*Langere v. Verizon Wireless Servs., LLC*,
   983 F.3d 1115 (9th Cir. 2020) .................................................................. 37

*Local Loan Co. v. Hunt*,
   292 U.S. 234 (1934) .................................................................................... 3

*In re Lyondell Chem. Co.*,
   543 B.R. 127 (Bankr. S.D.N.Y. 2016) .................................................. 17, 18, 19

*Manzano v. Metlife Bank N.A.*,
   2011 WL 2080249 (E.D. Cal. May 25, 2011) ........................................... 38

*MAO-MSO Recovery II, LLC v. Mercury Gen.*,
   2018 WL 3357493 (C.D. Cal. May 23, 2018) ........................................... 38

*Marshall v. Marshall*,
   547 U.S. 293 (2006) .................................................................................. 33

*In re Maxwell Communications Corp.*,
  186 B.R. 807 (S.D.N.Y. 1995) ........................................................................ 22

*In re Midland Euro Exch. Inc.*,
  347 B.R. 708 (Bankr. C.D. Cal. 2006) ........................................................ 18, 19

*Morrison v. Nat'l Austl. Bank Ltd.*,
  561 U.S. 247 (2010) .............................................. 16, 17, 18, 22, 23, 34, 35, 36, 37

*N. Pipeline Const. Co. v. Marathon Pipe Line Co.*,
  458 U.S. 50 (1982) ......................................................................................... 33

*Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*,
  549 B.R. 56 (S.D.N.Y. 2016) ......................................................................... 24

*Pepper v. Litton*,
  308 U.S. 295 (1939) ............................................................................... 3, 4, 33

*In re Picard*,
  917 F.3d 85 (2d Cir. 2019) ...................................................................... 29, 31

*Popov v. Countrywide Fin. Corp.*,
  2009 WL 5206679 (E.D. Cal. Dec. 18, 2009) ................................................. 38

*RJR Nabisco, Inc. v. Eur. Cmty.*,
  579 U.S. 325 (2016) ......................................................... 16, 17, 18, 19, 34

*In re Rosenshein*,
  136 B.R. 368 (Bankr. S.D.N.Y. 1992) ............................................................ 20

*Sale v. Haitian Ctrs. Council, Inc.*,
  509 U.S. 155 (1993) ....................................................................................... 17

*Sampsell v. Imperial Paper Corp.*,
  313 U.S. 215 (1941) ......................................................................................... 5

*Sapiro v. Encompass Ins.*,
  221 F.R.D. 513 (N.D. Cal. 2004) ................................................................... 38

*Sherwood Investments Overseas Ltd.*,
  2015 WL 4486470 (Bankr. M.D. Fla. July 22, 2015) ..................................... 24

*Sherwood Partners, Inc. v. Lycos, Inc.*,
  394 F.3d 1198 (9th Cir. 2005) ......................................................................... 3

DLA PIPER LLP (US)
LOS ANGELES

APPELLANT'S OPENING BRIEF
CASE NO. 2:21-CV-7572-JAK

*In re Simon*,
   153 F.3d 991 (9th Cir. 1998) ............................................................34, 35, 36, 37

*SIPC v. Madoff Inv. Secs. LLC* (*Madoff*),
   480 B.R. 501 (Bankr. S.D.N.Y. 2012) ..................................................... 17, 18

*In re Smith*,
   966 F.2d 1527 (7th Cir. 1992) ....................................................................... 20

*Stand Up for California! v. U.S. Dep't of the Interior*,
   959 F.3d 1154 (9th Cir. 2020) ...................................................................... 27

*Stern v. Marshall*,
   564 U.S. 462 (2011) ............................................................................... 34, 36

*In re Turner*,
   859 F.3d 1145 (9th Cir. 2017) ........................................................................ 2

*U.S. Fid. & Guar. Co. v. Bray*,
   225 U.S. 205 (1912) ...................................................................................... 33

*U.S. v. Daccarett*,
   6 F.3d 37 (2d Cir. 1993) ............................................................................... 22

*U.S. v. Ho*,
   984 F.3d 191 (2nd Cir. 2020) ....................................................................... 22

*U.S. v. Miranda*,
   780 F.3d 1185 (D.C. Cir. 2015) .................................................................... 36

*U.S. v. Prevezon Holdings, Ltd.*,
   251 F. Supp. 3d 684 (S.D.N.Y. 2017) ..................................................... 21, 22

*U.S. v. Wolfenbarger*,
   2020 WL 2614958 (N.D. Cal. May 22, 2020) .............................................. 36

*Urista v. Bank of Am., N.A.*,
   2012 WL 10596 (N.D. Cal. Jan. 3, 2012) ..................................................... 37

*WesternGeco LLC v. ION Geophysical Corp.*,
   138 S. Ct. 2129 (2018).......................................................................... 17, 30

**Statutes and Court Rules**

11 U.S.C. § 101(54).............................................................................................. 26

DLA PIPER LLP (US)
LOS ANGELES

11 U.S.C. § 105 ....................................................................................... 2, 4, 37

11 U.S.C. § 501 ....................................................................................... 2, 3, 36

11 U.S.C. § 502 ................................................ 2, 3, 4, 14, 15, 33, 37, 38

11 U.S.C. § 524 ....................................................................................... 34, 35

11 U.S.C. § 541 ........................................ 3, 14, 17, 18, 19, 33, 34, 35

11 U.S.C. § 547 ................................................................ 4, 21, 22, 35

11 U.S.C. § 548 ..................................................................................... *passim*

11 U.S.C. § 549 ........................................................................................... 34

11 U.S.C. § 550 ..................................................................................... *passim*

11 U.S.C. § 704 ....................................................................................... 4, 33

11 U.S.C. § 726 ............................................................................................. 4

11 U.S.C. § 1513 ............................................................................................ 3

18 U.S.C. § 1956 .......................................................................................... 22

18 U.S.C. § 2314 .......................................................................................... 22

28 U.S.C. § 157 ....................................................................................... 2, 3, 4

**Other Authorities**

5 Collier on Bankruptcy ¶ 548.03[4][a] (16th ed. 2021) ..................... 25, 29

H.R. Rep. No. 82-2320 (1952) ................................................................. 17

APPELANT'S OPENING BRIEF
CASE NO. 2:21-CV-7572-JAK

DLA PIPER LLP (US)
LOS ANGELES

## STATEMENT OF APPELLATE JURISDICTION

The Bankruptcy Court has subject matter jurisdiction over the Debtors' bankruptcy cases under 28 U.S.C. §§ 157 and 1334. On August 20, 2021, the Bankruptcy Court issued a final judgment in favor of Universal Leader Investment Limited ("UL"), Glove Assets Investment Limited ("Glove Assets"), Truly Great Global Limited ("Truly Great"), and Li Qi (collectively, "Defendants") on their motion to dismiss the Trustee's Amended Adversary Complaint ("FAC"). On August 31, 2021, the Trustee timely filed a notice of appeal. This Court has appellate jurisdiction under 28 U.S.C. §§ 158(a)(1) and (c)(1).

## STATEMENT OF THE ISSUES

1.     Whether the Bankruptcy Court erred by dismissing the FAC.[1]

2.     Whether the Bankruptcy Court erred by holding that § 548 does not allow the Trustee to avoid transfers of an interest of a debtor in property that, absent a prepetition transfer, would have constituted property of the estate (disagreeing with *In re French*, 440 F.3d 145 (4th Cir. 2006)).

3.     Whether the Bankruptcy Court erred by holding that the presumption against extraterritoriality bars avoidance of a fraudulent transfer to a U.S. correspondent bank designated by a transferee to receive the transfer on its behalf.

4.     Whether the Bankruptcy Court erred by holding that § 548 does not allow the Trustee to avoid obligations fraudulently incurred in the U.S.

5.     Whether the Bankruptcy Court erred in declining to apply §§ 548 and 550 to avoid and recover extraterritorial transfers to the Defendants on account of fraudulent obligations incurred by the Debtors in the U.S.

6.     Whether the Bankruptcy Court erred by declining to apply § 548 to

---

[1] Unless otherwise noted, all section and chapter references are to the Bankruptcy Code (11 U.S.C. § 1, *et seq.*), all defined terms have the same meaning as in the FAC, and all emphasis is added.

1

1    recover fraudulent transfers made outside the U.S. from the Defendants that filed
2    proofs of claim in the U.S. pursuant to § 501 as part of the Bankruptcy Court's
3    inherent equitable power to adjust the debtor-creditor relationship and determine each
4    claimant's pro rata share of distributions from the estate and related statutory
5    provisions under 28 U.S.C. § 157(b) and §§ 105(a) and 502.

6         7.     Whether the Bankruptcy Court erred in dismissing Count VI that sought
7    to recharacterize a $15 million loan as an equity interest that was part of a proof of
8    claim filed with the Bankruptcy Court on the basis that funding of the loan was made
9    outside the U.S.

10        8.     Whether the Bankruptcy Court erred by dismissing Counts VIII and IX
11   because the Trustee did not file a separate Rule 15 motion for leave to amend.

12        9.     Whether the Bankruptcy Court erred by not granting the Trustee leave to
13   amend the original Complaint to add new claims or parties or both as part of the order
14   dismissing the original Complaint.

15        10.    Whether the Bankruptcy Court erred by dismissing Count X where the
16   Bankruptcy Court erroneously dismissed the other counts.

## STANDARD OF REVIEW

18        A bankruptcy court's dismissal of an action for failure to state a claim is
19   reviewed *de novo*. *In re Turner*, 859 F.3d 1145, 1148 (9th Cir. 2017). "Dismissal
20   without leave to amend is improper unless it is clear, upon *de novo* review, that the
21   complaint could not be saved by any amendment." *Gompper v. VISX, Inc*., 298 F.3d
22   893, 898 (9th Cir. 2002); *see also Turner*, 859 F.3d at 1148.

## STATEMENT OF THE CASE

24   **I.    Statutory Framework.**

25       **A.    The federal bankruptcy system is premised on the historical practice
            of equity jurisprudence.**

26       Bankruptcy has a unique place in federal law. The federal bankruptcy system
27   "occupies a full title of the United States Code" and "provides a comprehensive

2

system of rights, obligations and procedures, as well as complex administrative machinery." *Sherwood Partners, Inc. v. Lycos, Inc.*, 394 F.3d 1198, 1201 (9th Cir. 2005). This system is built on foundations particular to bankruptcy proceedings that are "inherently proceedings in equity" and, more specifically, "in the nature of proceedings *in rem*." *Local Loan Co. v. Hunt*, 292 U.S. 234, 240-41 (1934). Accordingly, bankruptcy courts are "essentially courts of equity" and apply "the principles and rules of equity jurisprudence." *Pepper v. Litton*, 308 U.S. 295, 303 (1939).

> **B.     The Bankruptcy Code provides the statutory framework governing the administration of claims and distribution of property of the estate to creditors on a fair and equitable basis.**

In enacting bankruptcy law, Congress "gave special attention to the subject of making the bankruptcy laws inexpensive in their administration" to "secure a prompt and effectual administration and settlement of the estate." *Katchen v. Landy*, 382 U.S. 323, 328 (1966). Bankruptcy courts have jurisdiction to hear and determine "all cases under title 11 [i.e., the Bankruptcy Code] and all core proceedings," including "allowance or disallowance of claims against the estate" (28 U.S.C. § 157(b)(2)(B)), "counterclaims by the estate against persons filing claims against the estate" (§ 157(b)(2)(C)), "proceedings to determine, avoid, or recover fraudulent conveyances," (§ 157(b)(2)(H)), and "other proceedings affecting . . . the adjustment of the debtor-creditor or equity security holder relationship" (§ 157(b)(2)(O)).

Chapter 5's provisions regulate the claims administration process (§§ 501-511) and define property of the estate (§ 541) to include all property "wherever located and by whomever held" around the globe. A creditor may file a "proof of claim" to assert its interest in, and receive distributions from, the estate. § 501. "Foreign creditors have the same rights regarding . . . participation in a case under [the Bankruptcy Code] as domestic creditors." § 1513. A proof of claim is "allowed" unless a party in interest objects. § 502(a). If an objection is made, the bankruptcy court "shall determine the

3

amount of such claim" and "allow such claim in such amount." § 502(b). A trustee must "object to the allowance of any claim that is improper." § 704(a)(5). A claim filed by the recipient of a fraudulent transfer (or other avoidable transfer) "shall" be disallowed unless the recipient has "paid the amount, or turned over any such property, for which such entity or transferee is liable." § 502(d).

"[A] bankruptcy court has full power to inquire into the validity of any claim asserted against the estate and to disallow it." *Pepper*, 308 U.S. at 305. After the bankruptcy case, proceeds are distributed to creditors with allowed claims pro rata less administrative expenses. § 726.

### C.   The Bankruptcy Code gives a trustee broad powers to avoid and recover transfers and obligations for the estate.

Chapter 5 (§§ 547, 548, 550) also gives a trustee power to avoid preference fraudulent transfers and fraudulently incurred obligations, and to recover such property for the estate. These avoidance powers ensure that *all* creditors are treated fairly and equitably by restoring what was wrongfully taken from, and thus depleted, the estate before commencement of the cases. Under § 548, a trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, if the transfer or incurrence of an obligation was made with actual intent to defraud creditors or was not made in exchange for reasonably equivalent value (known as "constructive fraud").

### D.   The Bankruptcy Code also grants the bankruptcy court inherent equitable powers.

Along with the express powers under the statutory framework above, the bankruptcy court retains general equitable powers under § 105(a) to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," which authorizes the bankruptcy court, consistent with power to adjudicate core proceedings under 28 U.S.C. § 157(b)(2), to enter orders adjusting the debtor-creditor relationship to ensure the equitable treatment of all creditors with respect to distributions from the estate. One aspect of this adjustment process is the equitable

1  power of the bankruptcy court to avoid and recover fraudulent and preferential

2  transfers made to a claimant to restore assets fraudulently or preferentially taken from

3  the estate before the bankruptcy so they can be distributed equally to all claimants.

4  Those powers also include the power to recharacterize transactions (i.e., disregarding

5  the form of a transaction that is at odds with its economic substance or "economic

6  realities"). *See In re Bonham*, 229 F.3d 750, 763-64 (9th Cir. 2000) (§ 105(a)

7  authorizes bankruptcy courts "to adjudicate equities arising out of the relationship

8  between the several creditors") (quoting *Sampsell v. Imperial Paper Corp.*, 313 U.S.

9  215, 219 (1941)).

10 **II.   Statement of the Facts.**

11     **A.   The Debtors' operations.**

12     Geoff Cassidy, the Debtors' former board member and managing director, is a

13 known fraudster. (5-ER-2305–2306 ¶¶ 74-76; 5-ER-2309 ¶ 91.) Cassidy entered the

14 private jet charter business in Singapore managing a single plane through his

15 company, AAC. (5-ER-2306 ¶ 77.) But he could not expand his business without

16 obtaining a "Part 135 Certificate" from the Federal Aviation Administration, which

17 is required to operate certain commercial flights for paying customers (*Id.* ¶ 78.) Part

18 135 Certificates are tightly regulated, difficult to obtain and maintain, and impose

19 significant, complex, and ongoing operational and safety requirements. (*Id.*)

20     Cassidy needed a partner with a Part 135 Certificate to bring his fraudulent

21 scheme to fruition. (*Id.* ¶¶ 77-78; 5-ER-2309–2310 ¶ 95.) James Seagrim and Matt

22 Walter owned a successful, revenue-generating charter airline (which became Zetta

23 USA) with a Part 135 Certificate. (5-ER-2306 ¶ 79.) Cassidy approached them about

24 creating a new, combined airline. (*Id.* ¶¶ 81-82.) Ultimately, Cassidy, Seagrim, and

25 Walter incorporated Zetta PTE in Singapore in July 2015. (5-ER-2307 ¶ 83.)

26     Cassidy operated the Debtors as a fraudulent, Ponzi-like scheme. Typical of a

27 Ponzi scheme, Cassidy used his fraudulent business plan and promised outsized returns

28 to induce investors and financiers to provide funds. (5-ER-2309–2310 ¶ 95; 5-ER-2315

¶ 128; 5-ER-2317 ¶ 131.) He used those funds to partially repay prior investors as well as to purchase overpriced planes from Bombardier and its broker Jahid Fazal-Karim in exchange for commercial bribes and kickbacks. In two years, Cassidy took at least $10 million in kickbacks, bribes, and embezzlement. At the same time, he saddled the Debtors with almost half a billion dollars in unsustainable debt for overpriced planes in a down market, all of which – as Cassidy knew and intended – was to the detriment of the Debtors and their creditors. (5-ER-2294 ¶ 1; 5-ER-2309 ¶ 93; 5-ER-2310–2315 ¶¶ 97-126.)

Cassidy first sought investment from Li, a wealthy investor residing in Hong Kong. (5-ER-2300 ¶ 35; 5-ER-2315 ¶ 128; 5-ER-2317 ¶ 131.) Li made several equity investments and loans to the Debtors through his alter ego companies: UL, Glove Assets and Truly Great. (5-ER-2317 ¶ 131.) Li also served as a director of Zetta PTE. (5-ER-2300–2301 ¶¶ 35-42; 5-ER-2303–2304 ¶¶ 56-64; 5-ER-2317 ¶ 133.)

### B.    The initial acquisitions of Planes 6 and 7.

In December 2015, Li, through UL and Glove Assets, lent the Debtors $100 million to purchase two private jets, Planes 6 and 7, on terms that were extremely unfavorable to the Debtors. (5-ER-2317 ¶¶ 131-32; 5-ER-2324 ¶¶ 174-77; 5-ER-2329–2330 ¶¶ 196-203; 5-ER-2333–2334 ¶¶ 216-21.)

The structure of the 2015 acquisitions. The Debtors' purchases were implemented through disguised finance leases ("2015 Finance Leases") under which UL and Glove Assets (as "Beneficiaries"), through a corporate trust at Wells Fargo in Utah as "owner trustee" and "Lessor" entered into "Master Aircraft Finance Leases" with the debtor Zetta PTE as "Lessee" that enabled the Zetta PTE to exercise a "purchase option" for no additional consideration following 60 "lease payments," (i.e., debt service calculated to repay "principal" and "interest" totaling $50 million, plus a $20 million "balloon" payment at the end of the term (implying a well-above-market 12% effective rate of return), which payment obligations could not be terminated. (5-ER-2327 ¶ 187; 5-ER-2340 ¶ 253; 5-ER-2486–2488.) The 2015

Finance Leases contained terms that were extremely unfavorable to the Debtors, called for "lease" payments that were well above market value, and also required the Debtors to pay $50 million per plane when each plane had a fair market value of $37.5 million and a value of $22.7-28.7 million per plane using a discounted cash flow analysis. (5-ER-2329 ¶ 197; 5-ER-2330–2331 ¶¶ 202, 204.)

The 2015 Finance Leases were required to close in the U.S. UL and Glove Assets required that Planes 6 and 7 be purchased, and the disguised financing transactions be consummated and obligations under such transactions thus incurred, in the U.S. to ensure that the aircraft qualified for registration under FAA regulations. (5-ER-2295 ¶ 8; 5-ER-2325 ¶ 178.) This was important because without FAA registration and the Part 135 Certificate, the planes would have no commercial value because the Debtors could not charter flights for paying customers. (5-ER-2325 ¶ 178.)

To bolster the ability to qualify for FAA registration, UL, Glove Assets, and the Debtors (1) required Zetta PTE to confirm that it "became obliged" in the U.S. when it took delivery of the Planes in Connecticut; (2) used a U.S. corporate trustee (nominal defendant Wells Fargo) to act as the "lessor" and "owner" to satisfy the FAA's U.S. citizen ownership requirements; (3) used an Oklahoma law firm to conduct the closing and file closing documents with the FAA (at least with respect to Plane 6); (4) required that the Planes be maintained at a U.S. maintenance facility; and (5) required all payments to be made in U.S. dollars to the "Payment Location" at the HSBC Bank in New York ("HSBC NY") for credit to the HSBC Bank Hong Kong ("HSBC HK") US correspondent bank account at HSBC NY in favor of UL's bank account in Hong Kong. (5-ER-2502 § 3.26) ("'Payment Location' means in relations to all payments hereunder: HSBC Bank, New York, USA, SWIFT code: MRMDUS33, Federal Routing number code: 021001088, For credit to: a/c [account number redacted], THE HONGKONG & SHANGHAI BANKING CORPORATION LIMITED, HONG KONG PRIVATE BANKING DIVISION, BIC:

7

HSBCHKHHPBD, In favour of: Universal Leader Investment Limited. A/C: [account number redacted]"). The parties also wanted the transactions to close in Connecticut because Connecticut law exempted aircraft from sales and use tax. (5-ER-2325 ¶ 178.)

All of the closing conditions were satisfied, and signature pages released, in the U.S. and, accordingly, the 2015 Plane 6 and 7 Leases became legally effective, and the Debtors thereby incurred obligations, in the U.S. to pay principal and interest in the form of "lease" payments to UL and Glove. (5-ER-2325 ¶ 178; 5-ER-2328 ¶¶ 191-94; 5-ER-2332-33 ¶¶ 211-14.)

Zetta Jet PTE subsequently paid approximately $12 million in such "lease payments" under the 2015 Plane 6 and 7 Leases from its U.S. dollar denominated bank account in Singapore, through a U.S. correspondent bank account, to HSBC NY. As noted above, the funds were then transferred by intrabank transfer to HSBC HK for credit to UL's bank account. (5-ER-2296 ¶ 9.)

### C.    The 2016 Minsheng Refinancing of Planes 6 and 7.

By summer 2016, the Debtors were once again out of cash. (5-ER-2335 ¶ 229.) Cassidy again approached Li, this time with a plan to refinance Planes 6 and 7 with Minsheng, an aviation financier based in the People's Republic of China. (5-ER-2335–36 ¶¶ 230-32.) Consistent with Cassidy's earlier promise to pay Li an exorbitant return to invest in Cassidy's fraudulent scheme, Cassidy and Li agreed that the refinancing would trigger the onerous early termination penalty under the 2015 Plane 7 Finance Lease, pay Li $55 million for Plane 7, and leave in place the full $47.4 million remaining on the 2015 Plane 6 Finance Lease, even though the Debtors would incur another $40 million in debt to Minsheng for the same plane. Cassidy thanked "uncle" Li for his earlier support and told him: "We are partners and we are the priority over the banks." (5-ER-2336 ¶ 231.)

The Minsheng Refinancing. The Debtors borrowed $80 million from Minsheng through disguised finance leases secured by Planes 6 and 7. (5-ER-2348–2350 ¶¶ 282,

8

288.) The transaction involved three steps, all of which closed simultaneously in the U.S.: (1) Minsheng (as buyer) and UL (Plane 7)/Glove Assets (Plane 6), through the same U.S. corporate trustee, Wells Fargo (as sellers), entered a sale-leaseback agreement under which UL/Glove Assets agreed to "sell" Planes 6 and 7 to Minsheng, (2) Minsheng then "leased" Planes 6 and 7 to TVPX, the Debtors' U.S. corporate trustee, under a finance lease whereby the Debtors agreed to pay "principal and interest" in 60 quarterly "rent" installments with a nominal $1 purchase option at the end of the term, which payment obligations could not be terminated, and (3) TVPX, in turn, subleased Plane 6 and 7 to Zetta USA with pass through repayment terms so that the Debtors could operate the aircraft under Zetta USA's Part 135 Certificate.

The $80 million in refinancing proceeds were used to pay:

(1)   $55 million to UL for Plane 7, at least $19 million more than the fair market value ($35.7 million), (5-ER-2339 ¶ 250; 5-ER-2346 ¶ 273);

(2)   $12,410,240 to a Minsheng affiliate to pay deposits on four aircraft, three of which were never delivered, (5-ER-2346 ¶ 273); and

(3)   $12,559,760 to Zetta PTE (*id.*). Cassidy promptly misappropriated $2.66 million and paid another $1 million to his company for his equity investment in Zetta PTE. (5-ER-2314 ¶ 124; 5-ER-2349 ¶ 284; 5-ER-2351–2352 ¶ 296.)

Unlike a typical refinancing, the Minsheng Refinancing – which covered both Planes 6 and 7 – did not extinguish the debt under the 2015 Plane 6 Finance Lease. Rather, under a supplemental "clarification" ("Plane 6 Clarification") (5-ER-2682–2710), the Debtors still owed $48.4 million, at 10% interest, to Glove Assets for the remaining principal balance on the 2015 Plane 6 Finance Lease. (5-ER-2344 ¶ 265.)

The Minsheng Refinancing was disastrous: it deepened the Debtors' consolidated insolvency by another $9 million, for a total balance sheet deficit of $32 million. (5-ER-2349 ¶ 283.)

The Minsheng Refinancing closes in, and transfers made through, the U.S. Like

DLA Piper LLP (US)
Los Angeles

the 2015 Finance Leases, the parties designed the Minsheng Refinancing to close in the U.S. through U.S. corporate trustees as "lessor" and "lessee" so that Planes 6 and 7 could be registered with the FAA and operated under the Part 135 Certificate and comply with U.S. citizenship requirements. (5-ER-2346–2347 ¶ 275.) The parties also selected a U.S. escrow agent, IATS, to use its U.S. bank account to disburse all closing payments.

The parties retained the Oklahoma law firm Daugherty Fowler to act as FAA counsel, gather and release signature pages from the closing room in Oklahoma, and immediately register the documents with the FAA in Oklahoma. (5-ER-2345 ¶ 270.) On September 20, 2016, after all closing conditions had been met, the parties closed the Minsheng Refinancing and incurred the obligations thereunder by releasing their signature pages in Oklahoma. (5-ER-2345–2346 ¶¶ 270-72.)

The parties required that all funds transferred at closing be held by IATS in Oklahoma at its bank account at Bank of America in New York. The parties required all transfers at closing go through U.S. banks to bolster FAA registration of Plane 6 and Plane 7. All closing funds were transferred from, through, and to U.S. bank accounts. (5-ER-2346 ¶ 272.) The FAC attached a chart showing the flow of funds. (6-ER-3443–3445.) Upon release of signature pages, IATS initiated wire transfers from its New York closing account: (a) $55 million to HSBC HK's US correspondent bank account at HSBC NY in favor of UL's bank account at HSBC HK in Hong Kong; (b) $12,410,240 to Minsheng; and (c) $12,559,760 to Zetta PTE. (5-ER-2346 ¶ 273.) The Planes were required to be registered with the FAA and operated by Zetta USA under its Part 135 Certificate. (*See e.g.*, 5-ER-2810, 2823, 2850; 6-ER-2944, 2957, 2984, 3076, 3088, 3115, 3208, 3220, 3247.) Daugherty Fowler registered the documents with the FAA in Oklahoma. (5-ER-2347 ¶ 276.) Plane 6 was delivered to, and accepted by, the Debtors in Oregon. (5-ER-2348 ¶ 278.)

**D.    The Third Investment.**

Cassidy's fraud was catching up to him by summer 2017. The Debtors

10

desperately needed capital to fund operations. Seagrim, Walter, and Cassidy pleaded with Li to make an additional loan. Li agreed to make an additional cash infusion. (5-ER-2355–2356 ¶ 318.)

In exchange for a $15 million "loan" ("Third Investment") from UL, Zetta PTE's California shareholders Seagrim and Walter would transfer approximately 20 percent of the equity to Truly Great. (5-ER-2356 ¶ 321.) Around June 12, 2017, Cassidy (as Managing Director of Zetta PTE) wrote Li, confirming a "shareholder loan" of $15 million that would be "interest free on the condition that new investors are brought in under the agreement with BNP Paribas." (5-ER-2356 ¶ 319.) At the time, the parties intended the Third Investment to be an equity investment, not a true loan. Li expressly rejected a bridge loan as opposed to an equity investment in a June 2017 email: "Until now, I invest the company about 119m USD, so when [Cassidy] come to ask another 15m USD to be bridge money, I don't agree, I have put one huge egg to one basket, big risk . . . . But I said I need another 10% shares, this is not to buy the shares, this is for the risk, otherwise it is too unfair[.]" (5-ER-2356 ¶ 320.)

### E.    The Debtors' Downfall.

By summer 2017, the Debtors desperately needed cash to pay their bills. (5-ER-2356–2357 ¶ 324.) Cassidy was searching for other victims, but he could not find them soon enough. (*Id.*) Zetta PTE's CFO discovered Cassidy's fraud during an audit and resigned. (5-ER-2357 ¶ 325.) In August 2017, Walter emailed the board and the Debtors' new CFO that the company had been operating without proper financial controls and accused Cassidy of running a Ponzi scheme. (*Id.* ¶ 326.) The board removed Cassidy and Tang from their roles at the Debtors, and the Debtors sued Cassidy for RICO and fraud. (*Id.* ¶¶ 327-28.) The Debtors could not recover and filed for bankruptcy on September 15, 2017. (*Id.* ¶ 329.)

### III.   Relevant Procedural History.

### A.    UL and Glove Assets file proofs of claim.

On April 6, 2017, UL and Glove Assets filed proofs of claim seeking

$78,869,523.90. (1-ER-95–192.) The UL proof of claim sought amounts due under the Third Investment as well as two earlier loans. (1-ER-95–117.) The Glove Assets proof of claim sought amounts due under the Plane 6 Clarification, which relates to the 2015 Plane 6 and 7 Finance Leases and was consummated as part of the Minsheng Refinancing. (1-ER-118–192.)

**B.     The Trustee files the adversary proceeding to avoid transfers and obligations with the Defendants.**

On September 13, 2019, the Trustee filed an adversary complaint ("Original Complaint") against the Defendants and Minsheng.[2] (1-ER-221–285.) The Original Complaint sought to avoid and recover fraudulent transfers and obligations on the 2015 Plane 6 and 7 Finance Leases and the $55 million payment to UL in the Minsheng Refinancing, to avoid and recover preferential transfers to the Defendants, to recharacterize the Third Investment as equity, to seek compensation for violation of the automatic stay, and to disallow proofs of claim. (1-ER-224 ¶ 6.)

On July 29, 2020, the Bankruptcy Court dismissed most of the Original Complaint based on the presumption against extraterritoriality ("First Ruling"). (*See generally* 4-ER-2126–2175.) The Bankruptcy Court denied the motion regarding the stay violation, and also granted the Trustee leave to amend. (4-ER-2173, 2175.)

On March 29, 2021, the Trustee filed the FAC. (5-ER-2292–2873; 6-ER-2874–3445.) In addition to the previous claims, the FAC added new counts to recharacterize the 2016 Planes 6 and 7 Leases as disguised financings in response to grounds raised by the Defendants in their motion to dismiss the Original Complaint.[3] (1-ER-314–317, 328; 5-ER-2383–2387 ¶¶ 499-503, 509-525.)

On August 17, 2021, the Bankruptcy Court struck the new counts and dismissed

---

[2] The Trustee settled with Minsheng.
[3] The Trustee did not reassert the preference claims. He intends to bring the preference claims in Singapore and they are not part of this appeal.

12

1    the FAC without leave to amend ("Second Ruling").[4] (35-ER-10350–10394.) Shortly

2    thereafter, the Bankruptcy Court entered final judgment. (35-ER-10407–10409.) On

3    August 31, 2021, the Trustee timely appealed. (35-ER-10427–10542.)[5]

4    **C.    Rulings Presented for Review.**

5         In First and Second Rulings, the Bankruptcy Court held that the §§ 548 and 550

6    claims as well as the recharacterization claim were impermissible extraterritorial

7    applications of the relevant statutes. Specifically, the Bankruptcy Court held that the

8    transfers to HSBC NY were "solely" foreign transfers because the transfer to HSBC

9    NY was only "routed" through that bank to UL's Hong Kong account. (4-ER-2157–

10   2160; 35-ER-10373.) The Bankruptcy Court further held that that the parties' decision

11   to close in the U.S. to ensure FAA registration of Planes 6 and 7, to use U.S. corporate

12   trustees, to use U.S. bank accounts and a U.S. escrow agent, to receive and pay funds

13   to HSBC NY, and other closing steps were insufficient to establish a domestic

14   application of § 548. (35-ER-10377.) In the Second Ruling, the Bankruptcy Court

15   rejected the Trustee's argument the obligations were incurred domestically even if the

16   transfers were extraterritorial because the meaning of "obligation" was not broader

17   than "transfer." In addition, the Bankruptcy Court reasoned that because § 548

18   focuses on the initial fraudulent conduct that 'depletes' the estate, the alleged

19   fraudulent incurrence of obligations alleged in the FAC, including closing

20   "obligations", in the U.S. "did not deplete the estate of anything." (35-ER-10377.)

21   The Bankruptcy Court further held that the Trustee was precluded from recovering

22   transfers made in repayment of a fraudulently incurred obligation under § 550 because

23

24   _____

     [4] The Bankruptcy Court held that an entity debtor seeking civil contempt damages for

25   violating the automatic stay must proceed by motion. (35-ER-10389–10390 n.26.)
     The Trustee reserves his right to bring a motion and the claim is not part of this appeal.

26   [5] Li also moved to dismiss based on lack of personal jurisdiction. (8-ER-3681–4434.)
     The Trustee opposed the motion and moved for jurisdictional discovery. (25-ER-

27   5485–5582; 26-ER-5583–5670.) The Bankruptcy Court held that the Orders mooted

28   both motions and did not reach the merits. (35-ER-10394.)

DLA PIPER LLP (US)
LOS ANGELES

APPELLANT'S OPENING BRIEF
CASE NO. 2:21-CV-7572-JAK

1  that section only addresses avoided transfers, not fraudulently incurred obligations.

2  (35-ER-10378.)

3      In both Rulings, the Bankruptcy Court similarly dismissed the

4  recharacterization count for the Third Investment because, although the equity was

5  transferred from the Debtors' California principals, the loan proceeds were transferred

6  outside the U.S. (4-ER-2144–2145, 2163–2164; 35-ER-10384–10385.) The

7  Bankruptcy Court dismissed the § 502(d) claim since it was predicated upon the

8  sufficiency of the other avoidance counts. (35-ER-10389.)

9      Finally, the Bankruptcy Court dismissed the recharacterization counts with

10  respect to the 2016 Plane 6 and 7 Finance Leases because those counts were outside

11  the leave to amend in the First Ruling. (35-ER-10387–88.)

12                          **SUMMARY OF THE ARGUMENT**

13      The Bankruptcy Court's judgment should be reversed for seven reasons.

14      First, the Bankruptcy Court erred when it held that § 548 does not apply

15  extraterritorially. Because the statutory text of § 548 allows the Trustee to avoid any

16  transfer of "an interest of the debtor in property" that would have become estate

17  property, courts have held that § 548 incorporates the extraterritorial definition of

18  property of estate in § 541 which covers an interest of a debtor in property "wherever

19  located." Thus, § 548 grants a trustee the power to avoid any fraudulent transfer of

20  property "wherever located," even where the transfer occurs outside the U.S.

21      Second, the Bankruptcy Court erred when it determined that transfers of the

22  Debtors' funds to UL's U.S. correspondent bank in New York was "solely" a foreign

23  transfer. Analogous caselaw holds that a claim involving the deliberate use of U.S.

24  correspondent bank accounts to effect a "transfer" involves the domestic application

25  of a statute. Because the parties expressly designated UL's U.S. correspondent bank

26  account at HSBC NY as the "payment location" for all transfers, the Trustee's claims

27  only seek to apply § 548 domestically.

28      Third, the Bankruptcy Court erred when it determined that the Trustee cannot

avoid obligations incurred by the Debtors in connection with the 2015 Planes 6 and 7 Finance Leases and the Minsheng Refinancing. The Bankruptcy Court disregarded the second prong of § 548 that focuses on the fraudulent incurrence, rather than performance, of obligations. The Bankruptcy Court also improperly imposed a depletion of property requirement on the second prong of § 548 to avoid a fraudulently incurred obligation. The FAC alleges that the Debtors fraudulently incurred obligation in the U.S. because the transactions closed in the U.S. (including collection and release of signature pages in the U.S., execution of documents in the U.S., acceptance of aircraft in the U.S., and transfers of closing funds through U.S. bank accounts). Thus, the Trustee's claims only seek to apply § 548 domestically.

Fourth, the Bankruptcy Court erred when it applied an extraterritoriality analysis to subsequent transfers on account of the fraudulently incurred obligations. The Bankruptcy Court did not apply precedent holding that once the initial fraudulent conduct that is the focus of § 548 has been established to have occurred in the U.S., the Trustee may avoid and recover subsequent transfers regardless whether they are extraterritorial.

Fifth, contrary to established Ninth Circuit precedent, the Bankruptcy Court erred when it held that UL's and Glove Assets' filing of proofs of claim did not invoke the equitable jurisdiction of the bankruptcy court to avoid and recover extraterritorial transfers to UL and Glove as part of the domestic claims adjustment process.

Sixth, the Bankruptcy Court erred by dismissing the Trustee's claim to recharacterize a $15 million "loan" as an equity interest. The $15 million "loan" was part of a proof of claim and thus is properly subject to the claims adjustment process.

Finally, the Bankruptcy Court erred in dismissing the § 502(d) claim because the FAC states other claims.

## **ARGUMENT**

### I.     **The Trustee asserted valid claims to avoid the relevant transactions.**

The Bankruptcy Court erred when it dismissed the Trustee's avoidance claims

15

1   as an impermissible extraterritorial application of § 548. Section 548 applies
2   extraterritorially, and even if it did not, this case involves only a permissible domestic
3   application of § 548.

4          In general, U.S. law "governs domestically but does not rule the world." *RJR*
5   *Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 335 (2016). This principal is embodied in
6   a canon of statutory construction – the "presumption against extraterritoriality" – that
7   provides that federal laws only apply domestically "[a]bsent clearly expressed
8   congressional intent to the contrary." *Id.* (citing *Morrison v. Nat'l Austl. Bank Ltd.*,
9   561 U.S. 247, 255 (2010)).

10          The Supreme Court has provided "a two-step framework for analyzing
11   extraterritoriality issues." *Id.* at 337. The two "steps" are independent and can be
12   analyzed in either order. *Id.* at 338 n.5.

13          The first step asks "whether the presumption against extraterritoriality has been
14   rebutted—that is, whether the statute gives a clear, affirmative indication that it
15   applies extraterritorially." *Id.* at 337. An express statement of extraterritorial
16   application is not needed, and "[a]ssuredly context can be consulted as well." *Id.* at
17   340 (quoting *Morrison*, 561 U.S. at 265).

18          The second step asks "whether the case involves a domestic application of the
19   statute." *Id.* at 337. Courts "target their inquiry on the focus of congressional concern,
20   or, in other words, the transactions that the statute seeks to regulate." *In re Arcapita*
21   *Bank B.S.C.(c)*, 575 B.R. 229, 244 (Bankr. S.D.N.Y. 2017) (cleaned up). "If the
22   conduct relevant to the statute's focus occurred in the United States, then the case
23   involves a permissible domestic application even if other conduct occurred abroad;
24   but if the conduct relevant to the focus occurred in a foreign country, then the case
25   involves an impermissible extraterritorial application regardless of any other conduct
26   that occurred in U.S. territory." *Nabisco*, 579 U.S. at 337. *See also In re Icenhower*,
27   757 F.3d 1044, 1050 (9th Cir. 2014).

28

1

    **A.**    **Under *Nabisco* and *Morrison*, § 548 applies extraterritorially.**

2          The Bankruptcy Court erred at the first step because the context of the

3 Bankruptcy Code shows that § 548 applies extraterritorially. An "express statement

4 of extraterritoriality is not essential" to overcome the presumption; rather, the

5 structure and history of the statute are also relevant to the analysis, and "context" may

6 be "dispositive." *Nabisco*, 579 U.S. at 339-40; *see also Morrison*, 561 U.S. at 265;

7 *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2137 (2018) ("If the

8 statutory provision at issue works in tandem with other provisions, it must be assessed

9 in concert with those other provisions."); *In re French*, 440 F.3d 145, 151 (4th Cir.

10 2006) ("courts may look to 'all available evidence,' . . . including the text of the

11 statute, the overall statutory scheme, and legislative history") (quoting *Sale v. Haitian*

12 *Ctrs. Council, Inc.*, 509 U.S. 155, 177 (1993)).

13          The extraterritorial reach of § 548 is evident when read in conjunction with

14 § 541(a). As *French* explained, § 548 allows a trustee to avoid any transfer of an

15 "interest of the debtor in property," while § 541(a) defines property of the estate as all

16 "interests of the debtor in property . . . wherever located and by whomever held" – in

17 other words, anywhere in the world. *See French*, 440 F.3d at 151 (quoting H.R. Rep.

18 No. 82-2320, at 15 (1952)). By incorporating the broad language of § 541 to define

19 the property a trustee may recover using his avoidance powers, "§ 548 plainly allows

20 a trustee to avoid any transfer of property that *would have been* 'property of the estate'

21 prior to the transfer in question – as defined by § 541 – even if that property is not

22 'property of the estate' now." *Id.* (emphasis original). "Congress made manifest its

23 intent that § 548 apply to all property that, absent a prepetition transfer, would have

24 been property of the estate, wherever that property is located." *Id.* at 152; *see also In*

25 *re Lyondell Chem. Co.*, 543 B.R. 127, 151-55 (Bankr. S.D.N.Y. 2016) (finding that

26 Congress intended § 548 to apply extraterritorially); *SIPC v. Madoff Inv. Secs. LLC*

27 (*Madoff*), 480 B.R. 501, 527 (Bankr. S.D.N.Y. 2012) (same); *In re FAH Liquidating*

28 *Corp.*, 572 B.R. 117, 124 (Bankr. D. Del. 2017) (adopting the reasoning of *French*

1    and *Lyondell*).

2       The Bankruptcy Court erred by failing to consider the surrounding provisions

3 of the Bankruptcy Code when it misread *Nabisco* to, in essence, require a statement

4 that "this law applies abroad." (*See* 4-ER-2144); *Morrison*, 561 U.S. at 265 (rejecting

5 that requirement). Although *Nabisco* noted that the question (at the first step) is

6 whether the statute "affirmatively and unmistakably" instructs that the statute will

7 apply abroad, the Court reiterated that "an express statement of extraterritoriality is

8 not essential." *Nabisco*, 579 U.S. at 335, 340. *Nabisco* found context dispositive,

9 noting that the statute at issue, RICO, did not expressly state that it applies to

10 racketeering activity in foreign countries, but its definition of "racketeering activity"

11 encompassed violations of predicate statutes that expressly apply extraterritorially. *Id.*

12 at 340. The same is true here because the phrase "interest of the debtor in property"

13 in § 548 incorporates the language of §541, which expressly applies extraterritorially.

14       In finding that § 548 does not apply extraterritorially, the Bankruptcy Court

15 relied in part on *In re Midland Euro Exch. Inc*., 347 B.R. 708 (Bankr. C.D. Cal. 2006),

16 a ruling rejected by both *Lyondell* and *Madoff*. *See Lyondell*, 543 B.R. at 153-54;

17 *Madoff*, 480 B.R. at 528. The court in *Midland Euro* misinterpreted *French's* holding

18 as based on the notion that estate property includes property transferred but not yet

19 recovered, which the court found inconsistent with language in § 541 requiring the

20 debtor to have an interest in the property as of the commencement of the case. *Madoff*,

21 480 B.R. at 528. However, *French* explicitly stated that its holding was *not* based on

22 fraudulently transferred property falling within § 541's definition of estate property.

23 *Id.* (*citing French*, 440 F.3d at 151 n.2). Rather, it was based on the incorporation of

24 § 541's "interest[] of the debtor in property" language into § 548, which allows the

25 trustee to avoid and recover all transfers that would have been estate property but for

26 the fraudulent transfer. *Madoff*, 480 B.R. at 528.

27       Moreover, as the *Lyondell* court noted in rejecting *Midland Euro*, it would be

28 inconsistent for § 541(a)(3) to define estate property to include property recovered

from anywhere in the world under § 550, but to prohibit a trustee from avoiding and recovering fraudulent transfers that occurred primarily outside the U.S. *Lyondell*, 543 B.R. at 154-55.

For the foregoing reasons, this Court should reject *Midland Euro's* reasoning and reverse the Bankruptcy Court's dismissal of the Trustee's § 548 claim on the basis that § 548 does not apply extraterritorially.

**B.     The Trustee's claims involve a domestic application of § 548 because the transfers were made, and obligations incurred, in the U.S.**

The Bankruptcy Court also erred at the second step because this case involves only a permissible domestic application of § 548. To be clear, finding error at either step mandates reversal. *See Nabisco*, 579 U.S. at 338 n.5.

Section 548 allows a trustee to "avoid any transfer . . . of an interest of the debtor in property *or* any obligation . . . incurred by the debtor, that was [fraudulently] made or incurred . . . ." *See* § 548. Thus, the focus of § 548 is two-fold: the avoidance of fraudulent *transfers made* by the debtor or the avoidance of fraudulent *obligations incurred* by the debtor. Because the allegations in the FAC incontrovertibly demonstrate that transfers of interests of the Debtors in property *were made* in the U.S., and that the Debtors *incurred* obligations in the U.S., the Trustee is seeking only a domestic application of § 548 rather than an extraterritorial application, as the Bankruptcy Court incorrectly found.

**1.     The first prong of § 548: Transfers Made.**

The focus of § 548 regarding the first prong of § 548 is "the initial transfer that depletes the property that would have become property of the estate." (*See* 4-ER-2151 (citing cases)); *Arcapita*, 575 B.R. at 244. Here, the transfers made to the Defendants came from funds that would have become property of the estate. As noted above, "property of the estate" under § 541 includes property of a debtor "wherever located." Thus, funds in Zetta PTE's dollar-denominated Singapore account would have become property of the estate. Similarly, the Debtors had an interest in the $80 million

in loan proceeds advanced by Minsheng into the IATS escrow account under the disguised financing 2016 Plane 6 and 7 Finance Leases. These funds – the Debtors' loan proceeds – would also have constituted "an interest of the debtor in property" absent transfer. *See In re Bay Plastics*, 187 B.R. 315, 336 (Bankr. C.D. Cal. 1995) (transfer of loan proceeds by lender to selling shareholders constituted transfer of debtor property for purposes of California uniform fraudulent transfer act); *In re Appleseed's Intermediate Holdings, LLC*, 470 B.R. 289, 297-98 (D. Del. 2021) (paying loan proceeds directly from lenders to debtors' shareholders was fraudulent transfer of debtor's property even though debtor never possessed funds and debtor was obligated to pay loan proceeds as shareholder dividend under loan agreement); *In re Rosenshein*, 136 B.R. 368, 373-74 (Bankr. S.D.N.Y. 1992) (loan proceeds deposited in escrow with title insurer constituted property of the estate because debtors were not "merely acting as a conduit for the funds" but signed mortgage notes for the loans and deposited loan proceeds into escrow); *see also In re Smith*, 966 F.2d 1527, 1533 (7th Cir. 1992) (noting that a debtor's transfer of borrowed funds is a transfer of an interest of a debtor in property and is avoidable).

The analysis thus turns on whether the transfers to HSBC NY – the contractual "payment location" – were domestic or extraterritorial. If the transfer was domestic, there is no extraterritorial application of § 548. See *Arcapita*, 575 B.R. at 243.

The FAC alleges initial domestic transfers:

(1)  Zetta PTE transferred funds from its U.S. dollar-denominated account in Singapore through a U.S. correspondent bank (5-ER-2296–2298 ¶¶ 11, 16; 5-ER-2366–2367 ¶¶ 406; 6-ER-3436–3440 column 4, n.1.);

(2)  Once the closing conditions occurred and the Debtors incurred their obligations under the Minsheng Refinancing, IATS transferred $55 million of the $80 million in loan proceeds out of the IATS Bank of America account in Oklahoma (5-ER-2346 ¶¶ 272-73.); and

(3)  The transfers were made to HSBC HK's correspondent bank account at

20

1   HSBC NY, the "payment location" defined by the 2015 Plane 6 and 7

2   Finance Leases.

3   (4)   Following these transfers, these funds were credited through an intrabank

4         transfer to UL's Hong Kong bank account.

5   Notwithstanding these allegations, the Bankruptcy Court held that the FAC

6   sought an extraterritorial application of § 548 because the transfers were "solely"

7   foreign. In reaching this conclusion, the Bankruptcy Court held that "although

8   initially routed through New York, the funds were to be sent to [UL's bank account]

9   in Hong Kong." (4-ER-2144.) The Bankruptcy Court disregarded the initial transfers

10  from Zetta PTE and IATS to HSBC HK's correspondent bank account at HSBC NY

11  in New York and focused exclusively on the subsequent HSBC intra-bank transfer

12  into UL's Hong Kong bank account.

13  In doing so, the Bankruptcy Court erred. The parties specifically made a U.S.

14  bank account at HSBC NY the "payment location," not a bank account located in

15  Hong Kong. Contrary to the Bankruptcy Court's holding, the use of U.S.

16  correspondent bank accounts in foreign transactions between foreign parties

17  constitutes domestic conduct under § 548. *See Arcapita*, 575 B.R. at 245 (citing *U.S.

18  v. Prevezon Holdings, Ltd.*, 251 F. Supp. 3d 684, 694 (S.D.N.Y. 2017)).

19  In *Arcapita*, the debtor, a bank in Bahrain, transferred funds from its New York

20  bank account at JP Morgan to HSBC NY to fund proceeds from the placement of

21  investments negotiated and signed in Bahrain. *Id.* at 233-34. HSBC NY was a U.S.

22  correspondent bank of Khaleeji Commercial Bank ("KCB") in Bahrain. *Id.* The

23  defendant – Tadhamon – had a Bahraini bank account with KCB. *Id.* The funds

24  transferred to HSBC NY were immediately transferred to Tadhamon's account at

25  KCB in Bahrain. *Id.*

26  The *Arcapita* court analyzed the "focus" of § 547 and held that "the *receipt* of

27  the transferred funds in New York correspondent bank accounts is at the heart of this

28  cause of action" because "the receipt of the funds in New York is precisely the

21

conduct targeted by the [plaintiff], and the activity that the cause of action seeks to have voided." *Id.* at 239 (cleaned up). The *Arcapita* court noted that the same extraterritoriality analysis applies to both § 547 and § 548 because "the relevant language is the same in both." *Id.* at 244 n.6. Here, as in *Arcapita*, the focus of the Trustee's claim is the initial transfer, in which UL purposely selected and used a U.S. correspondent bank to effectuate this transaction.

Courts interpreting the term "transfer" in other federal statutory contexts (such as the federal transportation of stolen goods[6] and money laundering statutes[7]) routinely hold that the use of U.S. correspondent banks in foreign transactions between foreign parties constitutes domestic conduct within a statute's reach. *Prevezon*, 251 F. Supp. 3d at 692; *see also U.S. v. Ho*, 984 F.3d 191, 205 (2nd Cir. 2020) (courts "have long conceived of transfers from one place to another as being severable, and resting in the United States, when moving through correspondent banks"); *U.S. v. Daccarett*, 6 F.3d 37, 54 (2d Cir. 1993) ("with each EFT [electronic funds transfer] at least two separate transactions occurred: first, funds moved from the originating bank to the intermediate bank; then the intermediary bank was to transfer the funds to the destination bank, a correspondent bank in Colombia").

The Bankruptcy Court compounded its error by applying a "fact dependent" test that considered "all component events of the transfers," relying primarily on a pre-*Morrison* decision, *In re Maxwell Communications Corp.* (*Maxwell I*), 186 B.R. 807, 816-17 (S.D.N.Y. 1995). *Maxwell I* is of questionable viability post-*Morrison*: "It is not clear, however, how much of the more broad-ranging component event test . . . survives after the Supreme Court's decision in *Morrison* that instructs courts to examine the focus of the statute. The first case to assess the components events of a transaction was *Maxwell I* . . . . But *Maxwell I* was decided before *Morrison*, which

---

[6] 18 U.S.C. § 2314.
[7] 18 U.S.C. § 1956(a)(2)(A).

1   changed the legal landscape on this issue." *Arcapita*, 575 B.R. at 247.

2   Even if the component-events test survives *Morrison*, the Bankruptcy Court

3   misapplied it. The Bankruptcy Court listed eight components to be considered – "the

4   [nationality of] the parties, the 'transactions,' the choice of law provisions, the FAA

5   registration and Part 135 Certificate, the maintenance of the aircraft at a U.S. airbase,

6   the location of the closings, the use of U.S. corporate trustees, and the denomination

7   of the payments" in U.S. dollars. (4-ER-2155–2156.) Although the Bankruptcy Court

8   listed eight components, it only gave weight to the first three components, two of

9   which – nationality of the parties and choice of law – have little to do with the actual

10  "transfers," much less whether such transfers touched or concerned the U.S.

11  With respect to "transactions" component, the Bankruptcy Court bootstrapped

12  its erroneous conclusion disregarding the initial transfer to HSBC NY to find that the

13  transfers were "solely" foreign. (*See* 4-ER-2157.) This was error.

14  Moreover, the five factors discounted by the Bankruptcy Court – the FAA

15  registration and Part 135 Certificate, the maintenance of the aircraft at a U.S. airbase,

16  the location of the closings, the nominal trustees, and the denomination of payments

17  – all show why the parties deliberately structured the closings to occur in the U.S. and

18  the payments to flow through the U.S.: so that the Planes could be registered in the

19  U.S. and operated by Zetta USA. Without FAA registration and qualification under a

20  Part 135 Certificate, Planes 6 and 7 would not have been able to operate charters at

21  all, let alone enough to repay the loans. The 2015 Planes 6 and 7 Finance Leases and

22  the Minsheng Refinancing were unquestionably U.S. transactions. The Bankruptcy

23  Court failed to give these five factors sufficient weight under a component-events

24

25

26

27

28

1  test.[8]

2          The Bankruptcy Court also discounted the FAC's allegations regarding the

3  parties' use of IATS to hold closing funds in its Bank of America account in

4  Oklahoma and to disburse the funds to HSBC NY per UL's instructions. (*See* 4-ER-

5  2159.) The Bankruptcy Court found – on a motion to dismiss – that IATS never had

6  dominion and control over the funds. *Id.* This is irrelevant. Dominion and control are

7  only relevant to the identity of the initial transferee under § 550 (which governs the

8  liability of a transferee), not whether the debtors had an interest in the funds for

9  purposes of § 548. *See In re Incomnet, Inc.*, 463 F.3d 1064, 1069 (9th Cir. 2006)

10  (discussing the "dominion" and "control" tests for § 550). UL is the initial transferee

11  and obtained dominion and control over the payments when HSBC NY received the

12  funds in New York as agent for UL. *See Off. Comm. of Unsecured Creditors of*

13  *Arcapita v. Bahrain Islamic Bank,* 549 B.R. 56, 70 n.18 (S.D.N.Y. 2016) ("Khaleeji

14  [the U.S. correspondent branch] acted as Tadhamon [the foreign defendant

15  transferee]'s agent when it received the funds, and thus, Khaleej's receipt of funds in

16  New York can be imputed to Tadhamon").

17          **2.      The second prong of § 548: Obligations Incurred.**

18          Section 548 is disjunctive. It allows the Trustee to avoid not only fraudulent

19  transfers but also fraudulently incurred obligations. Unlike a fraudulent transfer, a

20

21  _____

22  [8] The other cases relied upon by the Bankruptcy Court are inapposite, as they involved
either (i) transfers occurring entirely outside the U.S. (*In re CIL Ltd.*, 582 B.R. 46, 68

23  (Bankr. S.D.N.Y. 2018) (transfer of equity interest of a UK company to a Marshall
Islands company occurring wholly outside the U.S.); *In re Ampal-Am.*, 562 B.R. 601,

24  603-04 (Bankr. S.D.N.Y. 2017) (transfer of Israeli shekels from Bank Hapoalim in
Tel Aviv to an Israeli law firm occurring entirely in Israel without any U.S. banking

25  nexus); *Sherwood Investments Overseas Ltd.*, 2015 WL 4486470, at *19 (Bankr.

26  M.D. Fla. July 22, 2015) (transfers made from bank account in Switzerland to RBS's
accounts in England; court found proper focus is actual "transfers," not parties'

27  relationship or locus)), or (ii) found that § 548 has extraterritorial application (*FAH*

28  *Liquidating,* 572 B.R. at 125; *see supra* at 17)).

1  fraudulently incurred obligation does not deplete an *asset* of an estate because it

2  affects the other side of a debtor's balance sheet – it is a *liability*. Thus, a fraudulently

3  incurred obligation artificially inflates a debtor's total liabilities, increasing the claims

4  pool. As the claims pool increases, recoveries to legitimate creditors are reduced and

5  recoveries to creditors holding fraudulently incurred claims are enhanced. 5 Collier

6  on Bankruptcy ¶ 548.03[4][a] (16th ed. 2021) ("Fraudulently incurred obligations

7  harm creditors. . . . Just as avoiding a transfer brings back assets to the estates to

8  increase distributions, avoiding an obligation decreases the claims against the already

9  existing estate assets, which then proportionately increases creditor dividends.").

10        The FAC's allegations demonstrate that the obligations incurred in the U.S.

11  under the 2015 Plane 6 and 7 Finance Leases, the Plane 6 Clarification, and the

12  Minsheng Refinancing added well over $200 million in fraudulent obligations to the

13  estate. (5-ER-2294–2295 ¶ 5; 5-ER-2348–2349 ¶¶ 282, 284.) Further, the FAC

14  alleges that the obligations under the 2015 Plane 6 and 7 Finance Leases, the Plane 6

15  Clarification, and the Minsheng Refinancing were incurred in the U.S.:

16      (1)   signature pages were sent to closing rooms in the U.S. and released to each

17           other at the closing room including signature pages from the Debtors under

18           guarantees (5-ER-2340 ¶ 252; 5-ER-2344–2346 ¶¶ 266, 270-71);

19      (2)   upon release of the signature pages in the U.S., the obligations under the

20           operative documents became legally effective and enforceable against the

21           Debtors (5-ER-2340 ¶ 252);

22      (3)   the parties chose U.S. corporate trusts to act as principals under the

23           operative documents and sign the operative documents as "lessors,"

24           "owners," and "lessees" (5-ER-2346–2347 ¶ 275);

25      (4)   Zetta USA signed its guarantee in the U.S. (5-ER-2345 ¶ 268);

26      (5)   the Debtors accepted the aircraft in the U.S., at which point they became

27           obliged to pay the Defendants. (5-ER-2328 ¶ 193; 5-ER-2489–2681; 5-

28           ER-2345–2346 ¶ 271; 5-ER-2348 ¶ 278);

1    (6)    with respect to the Minsheng Refinancing, all closing funds were wired
2           into a U.S. bank account and disbursed by a U.S. closing agent to the
3           parties. (5-ER-2346 ¶¶ 272-74);

4    (7)    the Debtors' obligations to pay "lease" payments under the 2015 Planes 6
5           and 7 Leases, the $55 million payment to UL under the Minsheng
6           Refinancing, and payment of principal and interest under the Plane 7
7           Supplement became effective upon satisfaction of conditions precedent
8           that occurred in the U.S. including the release of delivery of closing
9           documents and acceptance of Planes 6 and 7. (5-ER-2328 ¶¶ 191-94; 5-
10          ER-2332–2333 ¶¶ 211-14; 5-ER-2344–2346 ¶¶ 266-68, 270-71.)

11   Thus, the FAC sufficiently alleges that well over $200 million in fraudulent
12   obligations were added to the Debtors' balance sheets to the prejudice of legitimate
13   creditors, and that the Debtors incurred these obligations in the U.S. Accordingly,
14   there is no extraterritorial application of § 548 and the final judgment should be
15   reversed.

16   Despite the FAC's allegations of domestic activity, the Bankruptcy Court
17   dismissed the FAC. The Bankruptcy Court improperly focused on the definitions of
18   a "transfer" under the general definitional statute (§ 101(54)(D)) and "obligation" as
19   defined under inapplicable caselaw, without examining how those terms are used in
20   § 548. The Bankruptcy Court stated: "Congress' intent in referencing both a transfer
21   and an obligation in § 548 is clear: avoiding a transfer means that property transferred
22   would not belong to the transferee and avoiding an obligation would mean that the
23   debtor is not bound by the agreement or contract [and therefore] . . . the Court finds it
24   would be illogical to attribute a broader meaning to obligation than to transfer." (35-
25   ER-10369.)

26   From that predicate holding, the Bankruptcy Court held, in essence, that
27   because it found the transfers were extraterritorial, so too were the Debtors'
28   obligations to make the transfers. The Bankruptcy Court held that "none of the activity

26

1  that the Trustee highlights pertains to the focus of § 548, which is the transfer or

2  obligation that depletes the estate." (35-ER-10377.)

3      The Bankruptcy Court erred for two reasons. First, the meanings of the terms

4  "transfer" and "obligation," standing alone, do not determine whether a transfer or

5  obligation is extraterritorial under § 548. Rather, the focus of § 548 is whether a

6  transfer was *made* or an obligation was *incurred* in the U.S. The Bankruptcy Court

7  did not consider the verbs "made" and "incurred" that define exactly what transfers

8  or obligations are being regulated by § 548. The focus of the second prong of § 548

9  is the *incurrence* of fraudulent obligations *in the U.S.* – not the subsequent

10  performance of those obligations. The second, disjunctive prong of § 548 regulating

11  "obligation[s] *incurred*" would be rendered meaningless if it could reach only those

12  obligations that are subsequently paid through transfers made in the U.S. *See Stand*

13  *Up for California! v. U.S. Dep't of the Interior*, 959 F.3d 1154, 1159 (9th Cir. 2020)

14  ("In general, a statute should be construed so that effect is given to all its provisions,

15  so that no part will be inoperative or superfluous, void or insignificant.") (cleaned up).

16      Second, the Bankruptcy Court erred by requiring a fraudulently incurred

17  obligation to deplete *property* of the estate. (35-ER-10375.) Fraudulently incurred

18  obligations, by definition, initially affect only the right side of a debtor's balance

19  sheet: liabilities. Creditors are prejudiced by a fraudulently incurred obligation not

20  because of a reduction in estate assets (on the left side of the balance sheet), but rather

21  the fraudulent inflation of claims pool (on the right) that will reduce a legitimate

22  creditor's pro rata distribution of estate assets.[9] Thus, the Bankruptcy Court's

23  imposition of "property depletion" requirement to a second prong "obligation

24

25  _____

26  [9] For example, if a debtor has $100 million in distributable assets, $200 million in
27  legitimate claims, and $200 million in fraudulent claims, a legitimate claimholder
    holding a $10 million claim would receive only $2.5 million if fraudulent claims are
28  included in the claims pool. If fraudulent claims are excluded, the same claimholder
    would receive $5 million.

1    incurred" claim is reversible error.

2         Compounding this error, the Bankruptcy Court next examined conduct

3    occurring at or before closing and held that because these "obligations" – the

4    conditions precedent and other closing steps – "did not deplete the estate of anything,"

5    these "obligations" could not support a § 548 claim. (35-ER-10377.) Contrary to the

6    Bankruptcy Court's characterization, conditions precedent and closing steps outlined

7    in the FAC are not the "obligations" the Trustee seeks to avoid. Rather, the Trustee

8    seeks to avoid the obligations to pay over $200 million in principal and interest under

9    the 2015 Planes 6 and 7 Leases, the Minsheng Refinancing and the Plane 6

10   Clarification. The conditions precedent and the closing steps are not "obligations,"

11   but rather the domestic acts taken by the parties *in the U.S.* that resulted in the Debtors'

12   fraudulent incurrence of the payment obligations. These acts demonstrate that the

13   payment obligations were incurred in the U.S. by reason of, among other things, the

14   exchange of signature pages in the U.S., the acceptance of Planes 6 and 7 in the U.S.,

15   the registration of Planes 6 and 7 with the FAA in the U.S., and the transfer of funds

16   through U.S. bank accounts to UL's HSBC NY account. The Bankruptcy Court never

17   decided to the contrary. Thus, because the Bankruptcy Court did not properly consider

18   the allegations showing that the payment obligations under the 2015 Planes 6 and 7

19   Leases, the Minsheng Refinancing and the Plane 6 Clarification were incurred in the

20   U.S. in deciding in whether the Trustee stated a legally sufficient claims under § 548,

21   the Final Judgment should be reversed.

22        **3.    The Court may disgorge or avoid transfers (including**
              **extraterritorial transfers) made on account of domestic**
23            **obligations, and a trustee may recover subsequent transfers**
24            **outside of the U.S. under § 550.**

25        Once fraudulently incurred obligations are avoided, any transfers made on

26   account of such obligations are likewise avoidable. *See In re Brooke Corp.*, 541 B.R.

27   492, 507 (Bankr. D. Kansas 2015) ("[I]f the court avoids an obligation under section

28   548 . . . , transfers made by the debtor on account of that obligation are not made for

                                              28

reasonably equivalent value, and may be set aside as actually or constructively fraudulent if the other requirement for actual or constructive fraud are met.") (quoting 5 Collier on Bankruptcy ¶ 548.03[4][a]). For example, in *In re International Manufacturing Group, Inc.*, 2016 WL 7163588 (Bankr. E.D. Cal. Dec. 6, 2016), a trustee sought avoidance of obligations that the debtor incurred in favor of a bank. The bank argued that even if the trustee were to avoid the obligations, § 550 would not provide for recovery because that section does not refer to recovery on account of an obligation. *Id.* at 6. "The problem with the theory is that if one or more of the obligations are avoided, the trustee would be seeking . . . to recover the repayments made on the avoided obligations, repayments that were without question 'transfers.'" *Id*. If the trustee succeeds in avoiding the obligations, the payments on those obligations would similarly be avoidable and recoverable. *Id.* at 8; *see In re Bullion Reserve*, 922 F.2d 544, 546 n.2 (9th Cir. 1991) ("The theory under which a transfer has been avoided is irrelevant to the liability of the transferee against whom the trustee seeks to recover.").

Even if the subsequent transfers were extraterritorial, the avoidance of an extraterritorial transfer made on account of a domestic obligation is *not* subject to an independent extraterritoriality test. Once the initial fraudulent conduct – here, the Debtors' incurrence of a fraudulent obligation – is established, then any subsequent transfer made on account of the avoided obligation, even if extraterritorial, may be avoided and recovered made since the first prong of § 548 and § 550 work in tandem with the second prong of § 548 to regulate the Debtors' fraudulent conduct.

The Second Circuit in *In re Picard*, 917 F.3d 85 (2d Cir. 2019), considered whether a subsequent foreign transfer following an initial domestic fraudulent transfer was recoverable under § 550. *Id.* at 97-98. The Second Circuit held that the foreign transfer was recoverable if the initial transfer that depleted the estate was domestic. A general purpose of "the Bankruptcy Code's avoidance provisions, including [§ 548], [is] protect[ing] a debtor's estate from depletion to the prejudice of the unsecured

29

1    creditor." *Id.* at 97. The initial transfers were made in the U.S. and were thus subject

2    to avoidance under § 548. *Id.* at 98. Section 550(a) requires only avoidance of the

3    initial transfer that depletes the estate, because only the initial transfer involves

4    fraudulent conduct – indeed, any conduct – by the debtor. *Id.* The presumption against

5    extraterritoriality thus does not apply to subsequent transfers, so the location of any

6    initial or subsequent transferee did not matter. *Id.* at 100 ("The presumption against

7    extraterritoriality therefore does not prohibit that debtor's trustee from recovering

8    such property using § 550(a), regardless of where any initial or subsequent transferee

9    is located.").

10        *Picard* did not expressly deal with second prong of § 548 regarding

11   fraudulently incurred obligations; it only discussed transfers. However, its rationale

12   applies with equal force here. Section 548 regulates both fraudulent transfers and

13   fraudulently incurred obligations. It provides that both may be avoided. Thus, the

14   focus of § 548 is on the initial fraudulent conduct by the debtor that prejudiced

15   creditors – whether through a fraudulent transfer that depleted the estates or a

16   fraudulently incurred obligation that inflated claims. The latter harm was only

17   exacerbated by the Debtors' subsequent transfers to UL on account of the fraudulently

18   incurred obligations: not only did the Defendants fraudulently increase the claims

19   pool, thus reducing pro rata distribution to legitimate unsecured creditors, but they

20   also took property out of the estate to pay down the fraudulently incurred obligations.

21        Under *Picard*, the presumption against extraterritoriality does not prohibit the

22   Trustee from avoiding and recovering subsequent transfers made on account of

23   fraudulently incurred obligations. The initial fraudulent conduct – the incurrence of

24   the obligations – occurred in the U.S. and was thus domestic. Because *both* prongs of

25   § 548 work together with § 550, the subsequent transfers should be avoided to afford

26   a meaningful remedy for the Debtors' fraudulent conduct in fraudulently incurring the

27   obligations and making subsequent transfers on those obligations. *See WesternGeco*,

28   138 S. Ct. at 2137 ("If the statutory provision at issue works in tandem with other

30

provisions, it must be assessed in concert with those other provisions."); *Picard*, 917 F.3d 85, 98 (2d Cir 2019) ("Section 550(a) works in tandem with 548(a)(1)(A) by enabling a trustee to recover fraudulently transferred property."); *French*, 440 F.3d at 150 ("[Section] 548 focuses not on the property itself, but on the fraud of transferring it."); *Brooke*, 541 B.R. at 507 (first and second prongs work together).

The Bankruptcy Court held that because the incurrence of obligations in the U.S. did not "deplete the estate," there was no initial fraudulent conduct the U.S. Rather, "they were preliminary steps to the conduct that actually depleted the estate, which was the transfer of funds . . ." (35-ER-10379.) That ruling is both at odds with the focus of the second prong of § 548 to prohibit claims inflation and, if upheld, would render the second prong meaningless.

**C.    The Trustee may bring his avoidance claims because the relevant transactions are subject to federal bankruptcy law pursuant to the claims administration process.**

**1.    The proofs of claim, the fraudulent transfers/obligations and effect on distributions to creditors.**

*The Claims*. The Defendants filed proofs of claim seeking over $78 million on account of the obligations arising under the Plane 7 Clarification, the Third Investment and the two $10 million loans. Thus, the Defendants have filed claims for over $78 million under the Plane 6 Clarification and the Loan Agreements. (5-ER-2358.) The proofs of claim thus seek distributions from the estates on account of the very same obligations that the Trustee seeks to avoid. (*See e.g.*, 1-ER-151–182, 5-ER-2682–2710.)[10]

*The Fraudulent Transfers and Obligations*. In the FAC, the Trustee sought to

---

[10] Following entry of the Final Judgment, on September 7, 2021, the Defendants also filed a motion seeking $2,939,371.23 in attorneys' fees and $221,887.64 in non-taxable costs under the 2015 Plane 6 and 7 Leases and the Minsheng Refinancing. (Adv. Dkt. 336 at 2-3, 7-9.) The Defendants thus are again seeking distributions from the estates on account of the same obligations that the Trustee seeks to avoid.

DLA PIPER LLP (US)
LOS ANGELES

avoid over $77 million in transfers to UL, and almost $200 million in obligations incurred under § 548. (5-ER-2294–97 ¶¶ 5, 12; 5-ER-2318 ¶ 138; 5-ER-2329 ¶¶ 198; 5-ER-2338–40 ¶¶ 248-49, 251; 5-ER-2350 ¶¶ 288-90; 5-ER-2373–79; 5-ER-2385–87; 6-ER-3436–45.)

*Impact on Creditor Distributions*. The distributions to legitimate creditors will be dramatically reduced if the Trustee is not able to avoid and recover fraudulent transfers to the Defendants and avoid fraudulently incurred obligations. Creditor recoveries could be wiped out altogether or significantly reduced, and the Defendants would receive a windfall by not having to return fraudulent transfers made under the very agreements supporting their proofs of claim while receiving pro rata distributions on their fraudulently inflated claims. (*See* 30-ER-6717–6718.).

> **2.   Submitting a proof of claim on a transaction renders all aspects of that transaction subject to federal bankruptcy law, which makes the presumption against extraterritoriality irrelevant.**

The claims sought to be paid are transactions with the Debtors that need to be considered and resolved through the bankruptcy claims administration process. *See* §§ 501-511. By invoking the equitable process of administration, the Defendants made an election that fundamentally changed the nature of the rights that they held, the authority applicable to the transactions that are the subject of the claims, and the procedure used to adjudicate the claims.

"The whole process of proof, allowance, and distribution is, shortly speaking, an adjudication of interests claimed in a *res*." *Katchen*, 382 U.S. at 329-330 (quoting *Gardner v. N.J.*, 329 U.S. 565, 574 (1947)). Accordingly, upon submission of a proof of claim, the "creditor's claim" becomes "integral to the restructuring of the debtor-creditor relationship." *Lagenkamp v. Culp*, 498 U.S. 42, 44 (1990).

The filing of a proof of claim merges the transaction that is the subject of the claim into the *res* of the bankruptcy estate, thus rendering the transaction intrinsically domestic in nature. Since the inception of modern bankruptcy law, the filing of a proof

32

of claim has always been understood as an act that transforms a creditor's legal rights into an equitable interest wholly subject to the equitable process of administration. Before a proof of claim is filed, the creditor holds legal (as opposed to equitable) rights against a debtor. Those rights are pursued in courts of law, subject to various procedural restrictions and constitutional protections. Filing a proof of claim extinguishes those rights and replaces them with entirely different equitable, property-like interests in the *res* of the bankruptcy estate. *Katchen*, 382 U.S. at 336 (holding that filing a proof of claim "converts the creditor's legal claim into an equitable claim to a pro rata share of the *res*"). That transformation fundamentally narrows the procedural protections previously afforded to the parties and broadens the court's authority over the alleged conduct of the parties before it according to the distinct principles of equity jurisprudence and the exercise of "plenary power" over the bankruptcy *res*. *See Marshall v. Marshall*, 547 U.S. 293 (2006); *Ex parte Christy*, 44 U.S. 292 (1845).

The same reasoning establishes that an avoidance action on a proof of claim is a dispute that is fundamentally *in rem* in nature. Sections 502(d) and 704(a)(5) mandate that the trustee assert, and the bankruptcy court resolve, avoidance claims in connection with the claims administration process. Accordingly, an avoidance claim against the creditor on a proof of claim is equally "integral to the restructuring of the debtor-creditor relationship." *Langenkamp*, 498 U.S. at 44; *see also N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 54 (1982); *Pepper v. Litton*, 308 U.S. 295, 304 n.11 (1939); *U.S. Fid. & Guar. Co. v. Bray*, 225 U.S. 205, 217 (1912). Thus, when a proof of claim has been filed, the transaction is now subject to the equitable administration process and the bankruptcy court's "full power to inquire into the validity of any alleged debt or obligation of the bankruptcy upon which a demand or a claim against the estate is based." *Katchen*, 382 U.S. at 329. That also means that the adjudication of the avoidance action on a proof of claim is a dispute concerning the *res* of the estate and is subject to § 541. *Id.*

These principles still hold true today. In *Stern v. Marshall*, 564 U.S. 462 (2011), decided after *Morrison*, the Supreme Court reaffirmed that "he who invokes the aid of the bankruptcy court by offering a proof of claim and demanding its allowance must abide the consequences of that *procedure*." *Id*. at 496 (quoting *Katchen*, 382 U.S. at 333 n.9).

Accordingly, the Ninth Circuit and other courts recognize that submitting a proof of claim satisfies the requirement for domestic application of a statute. *See In re Simon*, 153 F.3d 991, 997 (9th Cir. 1998) ("because Hong Kong–Shanghai fully participated in the Simon bankruptcy, thus surrendering to United States jurisdiction . . . the presumption against extraterritorial effect of a statute does not apply"); *see also Diaz-Barba v. Kismet Acquisition, LLC*, 2010 WL 2079738, at *7 (S.D. Cal. May 20, 2010) ("when a party affirmatively invokes the jurisdiction of the bankruptcy court, the presumption against extraterritoriality does not apply to that party" in the context of §§ 549 and 550(a)(2)) (citing *Simon*); *In re Interbulk, Ltd.*, 240 B.R. 195, 199 (Bankr. S.D.N.Y. 1999) ("[Creditor] has submitted itself to the equitable jurisdiction of this court through the filing of a proof of claim, again unlike in *Maxwell*. I cannot conclude that the application of our laws to this set of facts would be an extraterritorial one."). Thus, given the claims filed here, as in *Simon*, this Court thus "need not decide" the first step under *Morrison* and *Nabisco*, whether the statute "applies extraterritorially in all cases." *Simon*, 153 F.3d at 997.

In the First Ruling, the Bankruptcy Court erred by failing to apply *Simon* to sustain the Trustee's claims. (4-ER-2167–2168.) The Bankruptcy Court first held that *Simon* dealt with a domestic application of the Bankruptcy Code because district courts have *in rem* jurisdiction over all estate property and none of the avoidance statutes contain such expansive language as § 524. (4-ER-2168.) The Bankruptcy Court only addressed the first issue raised in *Simon*: whether the discharge injunction could enjoin collection actions against debtor property under § 524(a)(3). Because the text of § 524(a)(3) expressly encompasses § 541 property of the estate "wherever

34

1   located" as within the scope of a discharge injunction, that part of *Simon*'s holding is

2   not controversial.

3   However, the Bankruptcy Court ignored the "more difficult problem" raised in

4   *Simon* regarding the extraterritorial enforceability of discharge injunction to cover a

5   collection action against the debtor personally, or against assets which did not form

6   property of the estate, under § 524(a)(2). *Simon*, 153 F.3d at 996-97. Like §§ 547

7   and 548, § 524(a)(2) does not contain a clear statement of extraterritorial

8   applicability. It states, in pertinent part: "A discharge in a case under this title . . .

9   operates as an injunction against the commencement or continuation of an action . . .

10  to collect, recover or offset any such debt as a personal liability of the debtor." Section

11  524(a)(2) does not refer to property of the estate under § 541, much less provide for a

12  discharge of personal liability anywhere in the world including against non-debtor

13  property. The *Simon* court held that it did not have to address this "more difficult

14  problem" because HSBC's filing a proof of claim submitted HSBC to the jurisdiction

15  of the bankruptcy court to adjudicate "an equitable claim to a pro rata share of the

16  res" and did not result an improper extraterritorial application of U.S. laws to enforce

17  the discharge against the debtor personally or against non-debtor property. *Simon*, 153

18  F.3d at 997. Thus, the Bankruptcy Court erred when it failed to apply this key aspect

19  of *Simon*.

20  Next, the Bankruptcy Court erroneously rejected the Trustee's arguments that

21  the filing of proof of claim by UL and Glove subjected them to the Bankruptcy Court's

22  equitable jurisdiction to recover fraudulent transfers under § 548 as part of the claims

23  adjustment process. Citing *Morrison*, the Bankruptcy Court argued that because the

24  extraterritorial reach of § 548 is a "merits" question, and not a jurisdictional one,

25  § 548 could not be invoked to avoid an extraterritorial transfer. (4-ER-2219.)

26  The Bankruptcy Court misread *Morrison* and imposed an inappropriate

27  statutory barrier to circumscribe a bankruptcy court's equitable powers. In *Morrison*,

28  the Supreme Court held that the extraterritorial application of a statute went to the

35

merits rather than the *subject matter* jurisdiction of the court. *Morrison*, 561 U.S. at 254. When a creditor files a proof of claim, it submits to the bankruptcy court's *equitable* jurisdiction to adjudicate the creditor's pro rata share of the *res* and waives any challenge to extraterritoriality. *See Simon*, 153 F.3d at 997. Thus, *Morrison*'s statement regarding "jurisdiction" has nothing to do with the bankruptcy court's equitable jurisdiction to invoke § 548 to avoid an extraterritorial transfer as part of the domestic claims adjustment process. Since the presumption against extraterritoriality is a merits question, UL and Glove Assets can, and did, waive any extraterritoriality objection through their voluntary domestic act of filing over $78 million in claims that triggered the domestic debtor-creditor adjustment process. Courts routinely hold that challenges to the extraterritorial application of a statute may be waived precisely because they are merits questions rather than jurisdictional ones. *See U.S. v. Miranda*, 780 F.3d 1185, 1191 (D.C. Cir. 2015); *U.S. v. Wolfenbarger*, 2020 WL 2614958, at *3, 5 (N.D. Cal. May 22, 2020).

As such, nothing in *Morrison* erodes the inherent equitable jurisdiction of a bankruptcy court to adjust the debtor-creditor relationship through the *domestic* claims administration process. As *Simon* noted, the claims process is by definition domestic, triggered by a creditor's domestic act of filing a proof of claim asking a U.S. bankruptcy court to determine the creditor's "equitable claim to a pro rata share of the res." § 501. *Simon*, 153 F.3d at 997. Sections 548 and 550 are integral tools to carry out a bankruptcy court's fundamental power to adjust the debtor-creditor relationship to insure equitable distributions of the *res* to creditors, *Katchen*, 382 U.S. at 329, and this precept was reaffirmed by the Supreme Court in *Stern*, decided one year after *Morrison*. *See Stern*, 564 U.S. at 497 (reaffirming *Katchen* and *Langenkamp* that avoidance claim can be heard through bankruptcy court's summary adjudication when creditor has filed claim because it becomes integral to restructuring of debtor-creditor relationship).

Accordingly, the Bankruptcy Court's dismissal of *Simon* as "unpersuasive"

36

ignores the inherently domestic nature of the claims process and creditor's domestic act triggering the process by filing a proof of claim, which *Morrison* did not address. *Simon* and *Morrison* "can coexist," and the Bankruptcy Court thus erred by refusing to apply *Simon* based on *Morrison*. *See Langere v. Verizon Wireless Servs., LLC*, 983 F.3d 1115, 1121–22 (9th Cir. 2020) (explaining that precedent remains binding unless the "Supreme Court has undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable" and that the "burden is high" to make such a showing).

## II.     Count VI of the FAC states a claim for recharacterization.

The Bankruptcy Court dismissed Count VI of the FAC on the grounds that June 27, 2017 transfer to fund the Third Investment was extraterritorial. This was error.

UL filed a proof of claim seeking a distribution on the Third Investment. In Count VI of the FAC, the Trustee seeks recharacterize the Third Investment as an equity interest and disallow the claim under §§ 105(a) and 502. The Trustee does not seek to avoid any transfer of funds under Count VI, but rather to object to and disallow a claim filed by UL. Objecting to a filed claim is a domestic application of these statutes. Whether the funding of the Third Investment occurred outside the U.S. is irrelevant. To hold otherwise would prevent a debtor from objecting to a claim that arose outside the U.S. This is not tenable under the precedent outlined above, including *Simon*.

## III.    The Bankruptcy Court erred in denying the Trustee's motion for leave to amend Counts VIII and IX.

The Bankruptcy Court erred in denying the trustee's motion for leave to amend Counts VIII and IX and granting the Defendants' motion to strike for three independent reasons. First, "[t]he right to amend is broad, and encompasses the right to add a new cause or theory of action." *Urista v. Bank of Am., N.A.*, 2012 WL 10596, at *6 (N.D. Cal. Jan. 3, 2012). Courts in the Ninth Circuit "generally allow plaintiffs to add new claims and/or parties to an amended complaint where a prior order of

dismissal granted leave to amend without limitation." *MAO-MSO Recovery II, LLC v. Mercury Gen.*, 2018 WL 3357493, at *4 (C.D. Cal. May 23, 2018). Accordingly, the recharacterization claims were within the scope of the Bankruptcy Court's leave to amend.

Second, even if the Trustee's amendments exceeded the scope of the Bankruptcy Court's order, they should not be struck. In contrast to the extreme liberality regarding amendment, "[c]ourts have long disfavored Rule 12(f) motions, granting them only when necessary to discourage parties from making completely tendentious or spurious allegations" that will prejudice the opposing party. *Sapiro v. Encompass Ins.*, 221 F.R.D. 513, 518 (N.D. Cal. 2004)); *Allen v. Cty. of Los Angeles*, 2009 WL 666449, at *2 (C.D. Cal. Mar. 12, 2009). Courts regularly deny motions to strike claims even when they exceed the scope of a court's leave-to-amend order. *See, e.g., Beavers v. New Penn Fin. LLC*, 2018 WL 385421, at *3 (E.D. Cal. Jan. 11, 2018); *Sapiro*, 221 F.R.D. at 518; *Manzano v. Metlife Bank N.A.,* 2011 WL 2080249, at *3 (E.D. Cal. May 25, 2011). In *Allen*, the court denied a motion to strike even though the "new claims exceed[ed] the scope of the court's leave to amend" because the defendant did "not assert prejudice" and the allegations were not "completely immaterial or redundant[.]" 2009 WL 666449, at *3. So too here.

Third, the Bankruptcy Court should have considered the FAC as a motion to amend. *See Popov v. Countrywide Fin. Corp.*, 2009 WL 5206679, at *2 (E.D. Cal. Dec. 18, 2009). "The policy of freely granting leave to amend should be applied with 'extreme liberality.'" *Id.* at *2 (quoting *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987)). Here, the Trustee did not delay amendment, did not seek amendment in bad faith, the amendments were not futile, and they did not prejudice the Defendants. *Id.*

## IV.   The FAC states a § 502(d) claim.

The Bankruptcy Court erred in dismissing Count X for disallowance of claims under § 502(d) because it incorrectly held that the Trustee failed to state claims under

38

§§ 548 and 550. (35-ER-10389.) The FAC states claims under §§ 548 and 550, so Count X should not have been dismissed.

<u>**CONCLUSION**</u>

For these reasons, the Trustee respectfully requests that the Court reverse the Bankruptcy Court's order dismissing the FAC without leave to amend.

DATED: December 30, 2021          **DLA PIPER LLP (US)**

By: */s/ David B. Farkas*
DAVID B. FARKAS
JOHN K. LYONS (*Pro Hac Vice*)
JEFFREY S. TOROSIAN (*Pro Hac Vice*)
JOSEPH A. ROSELIUS (*Pro Hac Vice*)

Attorneys for Appellant Jonathan D. King as Chapter 7 Trustee

# ADDENDUM OF STATUTORY PROVISIONS

**11 U.S.C. § 501. Filing of proofs of claims or interests.**

(a) A creditor or an indenture trustee may file a proof of claim. An equity security holder may file a proof of interest.

**11 U.S.C. § 502. Allowance of claims or interests.**

(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount . . . .

\*       \*       \*

(d) Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

**11 U.S.C. § 541. Property of the estate.**

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the

case.

\*      \*      \*

(3) Any interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title.

**11 U.S.C. § 548. Fraudulent transfers and obligations.**

(a)

(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)

(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)

(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that

1    would be beyond the debtor's ability to pay as such debts matured; or

2    (IV) made such transfer to or for the benefit of an insider, or incurred

3    such obligation to or for the benefit of an insider, under an

4    employment contract and not in the ordinary course of business.

5

6    **11 U.S.C. § 550. Liability of transferee of avoided transfer.**

7    (a) Except as otherwise provided in this section, to the extent that a transfer is avoided

8    under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee

9    may recover, for the benefit of the estate, the property transferred, or, if the court

10   so orders, the value of such property, from—

11   (1) the initial transferee of such transfer or the entity for whose benefit such

12   transfer was made; or

13   (2) any immediate or mediate transferee of such initial transferee.

14

15   **28 U.S.C. § 157. Procedures.**

16   (a) Each district court may provide that any or all cases under title 11 and any or all

17   proceedings arising under title 11 or arising in or related to a case under title 11

18   shall be referred to the bankruptcy judges for the district.

19   (b)

20   (1) Bankruptcy judges may hear and determine all cases under title 11 and all core

21   proceedings arising under title 11, or arising in a case under title 11, referred

22   under subsection (a) of this section, and may enter appropriate orders and

23   judgments, subject to review under section 158 of this title.

24   (2) Core proceedings include, but are not limited to—

25   *        *        *

26   (B) allowance or disallowance of claims against the estate or exemptions from

27   property of the estate, and estimation of claims or interests for the purposes

28   of confirming a plan under chapter 11, 12, or 13 of title 11 but not the

liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;

(C) counterclaims by the estate against persons filing claims against the estate;

\*        \*        \*

(H) proceedings to determine, avoid, or recover fraudulent conveyances;

\*        \*        \*

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims . . . .

1

## RULE 8015(h) CERTIFICATE OF COMPLIANCE

2

3       1. This document complies with the type-volume limit of Fed. R. Bankr. P.

4    8015(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R.

5    Bankr. P. 8015(g), this document contains 12,496 words.

6       2. This document complies with the typeface requirements of Fed. R. Bankr. P.

7    8015(a)(5) and the type-style requirements of Fed. R. Bankr. P. 8015(a)(6) because

8

9    this document has been prepared in a proportionally spaced typeface using Microsoft

10   Word for Office 365 in 14-point Times New Roman.

11                                    /s/ John K. Lyons

12   _____

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28